Nicole Hancock, ISB No. 6899
STOEL RIVES LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID  83702
Telephone:  208.389.9000
Facsimile:  208.389.9040
nicole.hancock@stoel.com

Hannah Brass Greer, ISB No. 8232
PLANNED PARENTHOOD OF THE GREAT
NORTHWEST AND THE HAWAIIAN ISLANDS
2001 East Madison Street
Seattle, WA 98122
Telephone: 206.427.3208
Hannah.BrassGreer@ppgnhi.org

Alice Clapman, *Pro Hac Vice application pending*
PLANNED PARENTHOOD FEDERATION OF
AMERICA
1110 Vermont Avenue NW
Washington, DC 20005
Telephone: 202.973.4862
alice.clapman@ppfa.org

Kim C. Clark, *Pro Hac Vice application pending*
LEGAL VOICE
907 Pine Street, Suite 500
Seattle, WA 98101
Telephone: 206.682.9552
Facsimile: 206.682.9556
kclark@legalvoice.org

Vanessa Soriano Power, *Pro Hac Vice application
pending*
vanessa.power@stoel.com
Jill D. Bowman, *Pro Hac Vice application pending*
jill.bowman@stoel.com
S. Julia Collier, *Pro Hac Vice application pending*
julia.collier@stoel.com
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: 206.624.0900
Facsimile: 206.386.7500
*Attorneys for Plaintiffs*

COMPLAINT - 1

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| PLANNED PARENTHOOD OF THE GREAT NORTHWEST AND THE HAWAIIAN ISLANDS, a Washington corporation; MARY STARK, on behalf of herself and her patients, | Case No. |
| Plaintiffs, | COMPLAINT |
| v. | |
| LAWRENCE G. WASDEN, in his official capacity as Attorney General of Idaho; JAN M. BENNETTS, in her official capacity as Ada County Prosecuting Attorney; GRANT P. LOEBS, in his official capacity as Twin Falls County Prosecuting Attorney; THE INDIVIDUAL MEMBERS OF THE STATE BOARD OF MEDICINE, in their official capacity; THE INDIVIDUAL MEMBERS OF THE STATE BOARD OF NURSING, in their official capacity, | |
| Defendants. | |

Plaintiffs, by and through their undersigned attorneys, bring this complaint against the above-named Defendants, their employees, agents, and successors in office, and in support thereof allege the following:

## PRELIMINARY STATEMENT

1.      Idaho law gives broad authority to certain "advanced practice clinicians" ("APCs") to perform many of the same tasks as licensed physicians, including evaluating and diagnosing patients, ordering and interpreting diagnostic tests, and initiating and managing treatments, including prescribing medication.[1]  These APCs include physician assistants and advanced practice registered nurses ("APRNs").  The latter is a category of professional caregivers that includes certified nurse practitioners and certified nurse midwives.

---

[1] Idaho Code §§ 54-1402, 54-1807A; Idaho Admin. Code r. 22.01.03.010, 22.01.03.028, 22.01.03.030, 22.01.03.042, 23.01.01.271, 23.01.01.280, 23.01.01.315; *see* American Association of Nurse Practitioners, *State Practice Environment*, https://www.aanp.org/legislation-regulation/state-legislation/state-practice-environment (last visited Nov. 15, 2018).

COMPLAINT - 2

2.      APCs are registered health care providers with advanced education and training. In Idaho, they are authorized to perform a variety of medical procedures that reflect this advanced training, ranging from delivering babies and inserting intrauterine contraceptive devices (IUDs), to performing endometrial biopsies (the removal of tissue from the uterine lining).[2]  The complexity of these health care services (among many others provided by APCs) is equal to or greater than that of medication and aspiration abortion, and childbirth poses far greater risks than abortion. Indeed, APCs can and do care for women experiencing miscarriages using both techniques that are identical to aspiration abortion and medications similar to or the same as medication abortion.[3]

3.      Idaho law does not permit APCs to provide abortion services notwithstanding that the State authorizes APCs to provide comparable – and in the case of miscarriage management, identical – health care services.  Under Idaho Code § 18-608A (the "Physician-Only Law"), only physicians are authorized to cause or perform abortions.  This restriction is both out of step with the State's treatment of comparable health care services and medically unjustified. Peer-reviewed medical literature uniformly demonstrates that APCs can safely and effectively provide medication and aspiration abortion care, and medical authorities ranging from the American College of Obstetricians and Gynecologists, to the American Public Health Association, to the World Health Organization, and the National Academies of Sciences, Engineering, and Medicine

---

[2] The Idaho Board of Nursing does not define specific procedures that an APRN may or may not provide. The Board states that an APRN's scope of practice is defined by their "education, preparation, experience and the parameters set forth by the advanced practice registered nurse's recognized, national certifying organization." Idaho Admin. Code r. 23.01.01.271.17. The Idaho Board of Medicine also does not define specific procedures that a physician assistant may or may not provide. The Board states that a physician assistant's scope of practice includes "a broad range of diagnostic, therapeutic and health promotion and disease prevention services." Idaho Admin. Code r. 22.01.03.028.01; *State Practice Environment, supra* note 1; American Academy of Physician Assistants, *PAs in Obstetrics and Gynecology* (May 2017), https://www.aapa.org/download/19515/.

[3] Diana Taylor et al., *Providing Abortion Care:  A Professional Toolkit for Nurse-Midwives, Nurse Practitioners, and Physician Assistants* 16-18 (2009), http://apctoolkit.org/wp-content/themes/apctoolkit/PDFs/APCToolkit_COMPLETEBOOK.pdf ("APC Toolkit"); Idaho Admin. Code r. 22.01.03.010, 22.01.03.028, 22.01.03.030.

COMPLAINT - 3

have all concluded that laws prohibiting APCs from providing this kind of abortion care are medically unfounded.[4]

4.     Moreover, because of limited physician availability in the State, the Physician-Only Law significantly constrains when and where abortion services are available in Idaho.  As a result, many women seeking abortions face significant and expensive travel burdens and delayed access to care, preventing some from obtaining an abortion altogether.  These onerous burdens far outweigh the law's nonexistent health justification.

5.     To prevent this medically unjustified restriction from inflicting further harm, Plaintiffs bring this civil rights action pursuant to 42 U.S.C. § 1983 on behalf of themselves and their patients.  Idaho's Physician-Only Law imposes an undue burden on abortion access in violation of Plaintiffs' patients' constitutional right to privacy and likewise violates the equal protection rights of Plaintiffs as well as their patients.  It should be declared unlawful and unconstitutional as applied to APCs who seek to perform medication and aspiration abortions, and its enforcement should be permanently enjoined.

6.     As with every single other health care service, existing scope of practice laws in Idaho are more than sufficient to ensure that APCs (like physicians) provide only care for which they are educationally and clinically prepared and for which competency has been maintained. The Physician-Only Law provides no medical benefit and serves only to harm Idaho women and the APCs who are legally barred from caring for them.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §§ 1331 and 1343(a)(3).

8.     Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202 and by Rules 57 and 65 of the Federal Rules of Civil Procedure.

9.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because all Defendants, who are sued in their official capacities, carry out their official duties at offices located in this district.

---

[4] *See* ¶¶ 51-57 below.

## PARTIES

**A.    Plaintiffs**

10.    Plaintiff Planned Parenthood of the Great Northwest and the Hawaiian Islands ("Planned Parenthood") is a not-for-profit corporation organized under the laws of the State of Washington and doing business in Idaho.  It is the largest provider of reproductive health services in Idaho, operating three health centers in the state, in Ada County and Twin Falls County.  Planned Parenthood provides a broad range of reproductive and sexual health services to women, men, and teens, including but not limited to, well person examinations, birth control, testing and treatment for sexually transmitted infections, cancer screening, pregnancy testing, and its physicians provide both medication and aspiration abortions.  Planned Parenthood sues on its own behalf and on behalf of its patients and its APCs.  Planned Parenthood employs APRNs and physician assistants who would provide abortions in Idaho if APCs were legally permitted to provide that service to their patients.

11.    Plaintiff Mary Stark has a Doctor of Nursing Practice and Masters of Nursing – Family Nurse Practitioner.  She is board certified by the American Nurses Credentialing Center as a Family Nurse Practitioner, and is licensed to practice advanced nursing in Idaho, Washington, and Oregon.  She provides services to patients in Boise, Meridian, and Twin Falls, Idaho, in Eugene, Oregon, and in various clinics throughout the state of Washington.  The services she provides include medication and aspiration abortions in Oregon, and medication abortions in Washington.  She would provide medication and aspiration abortion services to patients in Idaho, if legally permitted to do so.  She is bringing this action on her own behalf, and on behalf of her patients.

**B.    Defendants**

12.    Defendant Lawrence G. Wasden ("Wasden") is the Attorney General for the State of Idaho.  Wasden has authority to prosecute any APRN or physician assistant who violates Idaho's Physician-Only Law.  He is sued in his official capacity.

COMPLAINT - 5

13.     Defendant Jan M. Bennetts ("Bennetts") is the Ada County Prosecuting Attorney. Planned Parenthood's Boise and Meridian health centers are located in Ada County.  Bennetts has authority to pursue criminal charges or administrative penalties against any APRN or physician assistant who violates the Physician-Only Law.  She is sued in her official capacity.

14.     Defendant Grant P. Loebs ("Loebs") is the Twin Falls County Prosecuting Attorney.  Planned Parenthood's Twin Falls health center is located in Twin Falls County. Loebs has authority to pursue criminal charges or administrative penalties against any APRN or physician assistant who violates the Physician-Only Law.  He is sued in his official capacity.

15.     The individual members of the Idaho State Board of Medicine ("Board of Medicine") are also sued in their official capacity.  The Board of Medicine is a state agency defined in the Idaho Administrative Procedures Act. Idaho Code § 67-5201(2).  The Board of Medicine governs the licensing of all physician assistants in the state. Pursuant to Idaho Code §§ 54-1413 and 54-1814, the Board of Medicine has authority to investigate alleged violations of the Physician-Only Law, and to suspend, revoke or restrict all medical licenses that it issues.

16.     The individual members of the Idaho State Board of Nursing ("Board of Nursing") are also sued in their official capacity.  The Board of Nursing is a state agency defined in the Idaho Administrative Procedures Act. Idaho Code § 54-1403(1).  The Board of Nursing governs the licensing of all APRNs in the state. Pursuant to Idaho Code § 54-1404(2), the Board of Nursing has the authority to suspend, revoke or restrict all nursing licenses for failure to comply with the requirements of the Physician-Only Law.

## FACTUAL STATEMENT

### A.     Early Abortion Practice and Safety

17.     Access to abortion is critically important for women who face unwanted pregnancies. Nationwide, roughly one out of four women will have an abortion by the time she

reaches age 45.[5]  Approximately 60% of women having abortions already have at least one child.[6]

18.     Legal abortion is one of the safest services in modern health care.  Less than .5 percent of all abortion patients experience a complication that requires hospitalization, surgery or transfusion.[7]

19.     Abortion is far safer than carrying a pregnancy to term.  The mortality rate for childbirth is approximately 14 times higher than for first-trimester abortion, and every pregnancy-related complication is more common among women having live births than among those having abortions.[8]

20.     Although abortion is significantly safer than continuing pregnancy through childbirth, the risks associated with abortion increase as pregnancy advances.  According to one study, 58 percent of abortion patients in the United States would have liked to have had their abortion earlier in the pregnancy.[9]

21.     Early abortions are performed using medication or vacuum aspiration.  Both methods are extremely safe and effective.[10]

22.     "Medication abortion" is typically performed using a regimen of two prescription drugs, mifepristone and misoprostol.  Mifepristone, also known as "RU-486" or by its

---

[5] Guttmacher Institute, *Abortion Is a Common Experience for U.S. Women, Despite Dramatic Declines in Rates* (Oct. 19, 2017), https://www.guttmacher.org/news-release/2017/abortion-common-experience-us-women-despite-dramatic-declines-rates.
[6] Jenna Jerman et al., Guttmacher Institute, *Characteristics of U.S. Abortion Patients in 2014 and Changes Since 2008* (2016),  https://www.guttmacher.org/report/characteristics-us-abortion-patients-2014.
[7] Guttmacher Institute, *Induced Abortion in the United States* (Jan. 2018), https://www.guttmacher.org/fact-sheet/induced-abortion-united-states.
[8] Elizabeth G. Raymond & David A. Grimes, *The Comparative Safety of Legal Induced Abortion and Childbirth in the United States*, 119 Obstetrics & Gynecology 215 (Feb. 2012), http://unmfamilyplanning.pbworks.com/w/file/fetch/119312553/Raymond%20et%20al-Comparative%20Safety.pdf; *see also Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2315 (2016) (citing *Whole Woman's Health v. Lakey*, 46 F. Supp. 3d 673, 684 (W.D. Tex. 2014)).
[9] Rachel K. Jones & Jenna Jerman, Guttmacher Institute, *Time to Appointment and Delays in Accessing Care Among U.S. Abortion Patients*, 3 (2016), https://www.guttmacher.org/sites/default/files/report_pdf/delays-in-accessing-care.pdf (citing LB Finer et al., *Timing of Steps and Reasons for Delays in Obtaining Abortions in the United States,* 74(4) Contraception 334-44 (2006)).
[10] APC Toolkit at 8-11.

commercial name "Mifeprex," works first by temporarily blocking the hormone progesterone, which is necessary to maintain pregnancy, and by increasing the efficacy of the second medication in the regimen, misoprostol.  Misoprostol, which the woman generally takes at home 6-48 hours after the mifepristone, causes the uterus to contract and expel its contents.  The woman typically passes the pregnancy at home, in a process similar to a miscarriage.[11]

23.     In a vacuum aspiration abortion, the clinician inserts a small sterile tube through the cervix into the uterus.  A pump attached to the tube creates suction, which empties the uterine contents.  The procedure takes between five and ten minutes.[12]

**B.     Idaho's Physician-Only Law**

24.     Idaho law defines abortion as "the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child."[13]  This definition includes both medication and aspiration abortion.  Idaho law defines a "chemical abortion" as the "use of an abortifacient or combination of abortifacients to effect an abortion."[14]  An abortifacient is defined by the same statute as "mifepristone, misoprostol and/or other chemical or drug dispensed with the intent of causing an abortion."[15]

25.     Idaho's Physician-Only Law makes it "unlawful for any person other than a physician to cause or perform an abortion."  Idaho Code § 18-608A.

26.     Under Idaho Code § 18-605(3), any person who is licensed to provide health care pursuant to title 54, Idaho Code (including APRNs and physician assistants) and who knowingly violates the provisions of Idaho Code, Title 18, Chapter 6, is guilty of a felony.

27.     While Idaho's Physician-Only Law currently constrains APC's ability to provide abortion services, this restriction is not medically necessary.  In states across the country,

---

[11] Planned Parenthood, *What Can I Expect if I Take the Abortion Pill*,
https://www.plannedparenthood.org/learn/abortion/the-abortion-pill/what-can-i-expect-if-i-take-abortion-pill (last visited Nov. 15, 2018).
[12] APC Toolkit at 10-11.
[13] Idaho Code § 18-604(1).
[14] Idaho Code § 18-617(1)(b).
[15] Idaho Code § 18-617(1)(a).

COMPLAINT - 8

including California, Oregon, Vermont, Montana and New Hampshire, APCs are legally

permitted to provide aspiration abortion and medication abortion.[16]  APCs in New England have

been safely and effectively providing abortion care for decades.[17]

**C.**     **Scope of Practice of Advanced Practice Clinicians in Idaho**

<u>**Licensing Requirements**</u>

28.     To be licensed to perform advanced practice registered nursing in Idaho, a person

must

> (a) Be currently licensed to practice as a registered nurse in Idaho; and
>
> (b) Have successfully completed an approved advanced practice registered nursing education program that meets the board requirements for the role of advanced nursing practice for which the applicant is seeking licensure; and
>
> (c) Have passed a qualifying examination recognized by the board and have current certification from a national organization recognized by the board; and
>
> (d) Be of sufficiently sound physical and mental health as will not impair or interfere with the ability to practice nursing.

Idaho Code § 54-1409(1).

29.     To be licensed to practice medicine as a physician assistant in Idaho, a person

must pass an examination and submit an application, both of which are approved by the State's

Board of Medicine. Idaho Code § 54-1807A(1).  Additionally, "[t]he board shall determine and

limit the scope of activities of each physician assistant on the basis of completed courses of study

or programs of instruction received.  Upon licensure, the board shall authorize each physician

assistant to assist a physician or group of physicians who are qualified and approved by the board

to supervise physician assistants to engage in activities as limited by the board." *Id.*

<u>**Scope of Practice**</u>

---

[16] Donna Barry & Julia Rugg, Center for American Progress, *Improving Abortion Access by Expanding Those Who Provide Care* (Mar. 26, 2015), https://www.americanprogress.org/issues/women/reports/2015/03/26/109745/improving-abortion-access-by-expanding-those-who-provide-care/.
[17] APC Toolkit at 12.

COMPLAINT - 9

30.     An APRN is "a registered nurse licensed in [Idaho] who has gained additional specialized knowledge, skills and experience through a graduate or post-graduate program of study" and "is authorized to perform advanced nursing practice, which may include acts of diagnosis and treatment, and the prescribing, administering and dispensing of therapeutic pharmacologic and non-pharmacologic agents."  Idaho Admin. Code r. 23.01.01.271.02.  APRNs "when functioning within the recognized scope of practice, assume primary responsibility for the care of their patients in diverse settings."  *Id.*

31.     APRNs "include nurses licensed in the roles of certified nurse-midwife, clinical nurse specialist, certified nurse practitioner, and certified registered nurse anesthetist."  *Id.*  A certified nurse-midwife is "a licensed registered nurse who has graduated from a nationally accredited graduate or post-graduate nurse-midwifery program, and has current certification as a nurse-midwife from a national organization recognized by the Board [of Nursing]."  Idaho Admin. Code r. 23.01.01.271.05.

32.     Idaho's "core standards" require APRNs to, among other things, "provide client services  for which the advanced practice registered nurse is educationally prepared and for which competence has been achieved and maintained," "evaluate and apply current evidence-based research findings relevant to the advanced nursing practice role," and "assume responsibility and accountability for health promotion and maintenance as well as the assessment, diagnosis and management of client conditions to include the use of pharmacologic and non-pharmacologic interventions and the prescribing and dispensing of pharmacologic and non-pharmacologic agents."  Idaho Admin. Code r. 23.01.01.280.02.

33.     A certified nurse-midwife also "provides the full range of primary health care services to women throughout the lifespan, including gynecologic care, family planning services, preconception care, prenatal and postpartum care, childbirth, care of the newborn and reproductive health care treatment of the male partners of female clients."  Idaho Admin. Code r. 23.01.01.280.03.

34.     A physician assistant is a "person who is a graduate of an approved program and who is qualified by specialized education, training, experience and personal character" and "who has been licensed by the Board to render patient services under the direction of a supervising and alternate supervising physician."  Idaho Admin. Code r. 22.01.03.010.07.

35.     A physician assistant's scope of practice "shall be defined in the delegation of services and may include a broad range of diagnostic, therapeutic and health promotion and disease prevention services."  Idaho Admin. Code r. 22.01.03.028.01.  A physician assistant's "scope of practice may include prescribing, administering, and dispensing of medical devices and drugs, including the administration of a local anesthetic injected subcutaneously, digital blocks, or the application of topical anesthetics, while working under the supervision of a licensed medical physician."  *Id*.

36.     Although physician assistants practice under the supervision of a physician, that supervision need not be in person.  Idaho Admin. Code r. 22.01.04.09.

37.     Both APRNs and physician assistants perform a variety of services that were once performed by physicians, including many procedures that are equally or more complex than medication and aspiration abortion.

38.     For instance, they perform endometrial biopsies.  During this procedure, a sterile tube is inserted through a patient's cervix into the uterus and a small piece of tissue is suctioned from the uterine lining.[18]

39.     Similarly, APRNs and physician assistants perform colposcopies. During this procedure, instruments are used to magnify the cervix and, when appropriate, to remove tissue for biopsy.[19]

40.     APRNs and physician assistants insert (and remove) intrauterine devices (IUDs) through the patient's cervix into her uterus. IUDs are long-acting reversible contraceptive

---

[18] APC Toolkit at 18.
[19] *Id*.

devices.  APRNs and physician assistants also perform intrauterine insemination, a form of assisted reproductive technology that involves injecting sperm into a patient's uterus.[20]

41.     For each of these procedures, APRNs and physician assistants often provide lidocaine cervical blocks, a type of local analgesic (painkiller).[21]

42.     Most significantly, if a patient is experiencing a miscarriage, an APC in Idaho who is appropriately trained can use vacuum aspiration to complete the miscarriage (which reduces bleeding as well as the risk of infections and other complications).[22]  APCs in Idaho, including at least one at PPGNHI, also use this technique to remove any retained tissue in a patient's uterus following an abortion.  This procedure is *identical* to an aspiration abortion.

43.     Similarly, if a patient is experiencing a miscarriage, or if a patient has retained tissue in her uterus following an abortion, APCs in Idaho —including at PPGNHI—can and do safely provide medication to facilitate the evacuation of the uterus.

44.     The Legislature does not single out *any* health care service as beyond an APRN's or physician assistant's scope of practice—except abortion.  There is no medical justification for prohibiting APCs from performing aspiration procedures and prescribing medication for abortion while allowing them to use the very same procedures and medications in the context of miscarriage care.

**D.     APCs in Idaho Can Provide Safe, Effective Medication and Aspiration Abortion Care**

45.     Peer-reviewed studies uniformly conclude that APCs can safely and effectively provide medication and aspiration abortion care, and leading medical and public health authorities agree.

**Studies Consistently Establish that APCs Can Safely and Effectively Provide Medication and Aspiration Abortion Care**

46.     There is a large body of research that evaluates the comparative safety of early abortion care provided by APRNs and physician assistants versus the care provided by

---

[20] *Id.*
[21] *Id.*
[22] *Id.* at 16-18.

COMPLAINT - 12

physicians.  The peer-reviewed medical literature has unanimously concluded that APCs can safely and effectively provide aspiration abortions.

47.     For example, a 2013 study of aspiration abortion services compared 5,812 procedures performed by physicians with 5,675 procedures performed by APRNs and physician assistants.  *See* Tracy A. Weitz et al., *Safety of Aspiration Abortion Performed by Nurse Practitioners, Certified Nurse Midwives, and Physician Assistants Under a California Legal Waiver*, 103 Am. J. Pub. Health 454, 457 (2013).  The study found that "complications were rare" among both groups of practitioners and that such "complications were clinically equivalent between newly trained [nurse practitioners, nurse-midwives, and physician assistants] and physicians." *Id.* at 457, 454.  The results of the study "confirm existing evidence from smaller studies that the provision of abortion by [APCs] is safe and from larger international and national reviews that have found these clinicians to be safe and qualified health care providers." *Id.* at 459 (footnotes omitted).

48.     Other studies addressing the safety of advanced practice clinicians' provision of aspiration abortion similarly conclude that such clinicians "provided abortion services comparable in safety and efficacy to those of a physician service."  Marlene B. Goldman et al., *Physician Assistants as Providers of Surgically Induced Abortion Services*, 94 Am. J. Pub. Health 1352, 1356 (2004) (examining data on abortion care in Vermont); *see also* Shireen J. Jejeebhoy et al., *Can Nurses Perform Manual Vacuum Aspiration (MVA) as Safely and Effectively as Physicians? Evidence from India*, 84 Contraception 615, 620 (2011) (finding that aspiration abortion "can be provided with equal safety and effectiveness . . . by nurses as by physicians"); I.K. Warriner et al., *Rates of Complication in First-Trimester Manual Vacuum Aspiration Abortion Done by Doctors and Mid-Level Providers in South Africa and Vietnam: A Randomised Controlled Equivalence Trial*, 368 Lancet 1965, 1970 (2006) ("[F]irst-trimester abortions with manual vacuum aspiration are done equally safely by doctors and trained government-certified MLPs [mid-level practitioners]"); Mary Anne Freedman et al., *Comparison of Complication Rates in First Trimester Abortions Performed by Physician Assistants and*

COMPLAINT - 13

*Physicians*, 76 Am. J. Pub. Health 550, 553 (1986) (evidence from Vermont demonstrated that "there are no differences in complication rates between those women who had abortions performed by a physician assistant and those who had the procedure performed by a physician").

### Leading Medical and Public Health Authorities Support APCs Provision of Medication and Aspiration Abortions

49.     Consistent with the unanimous findings from this research, a significant array of leading medical authorities and professional associations support the provision of medication and aspiration abortions by APCs.

50.     The American College of Obstetricians and Gynecologists ("ACOG"), a professional association of more than 58,000 obstetrician-gynecologists, is the nation's leading organization of women's health care providers.

51.     ACOG expressly "oppos[es] restrictions [like the Idaho law] that limit abortion provision to physicians only or obstetrician–gynecologists only." ACOG, Committee Opinion No. 612, *Health Care for Underserved Women* (Nov. 2014, reaffirmed 2017), https://www.acog.org/Clinical-Guidance-and-Publications/Committee-Opinions/Committee-on-Health-Care-for-Underserved-Women/Abortion-Training-and-Education.

52.     In setting forth its opposition to physician-only laws, ACOG invoked the above-cited studies "show[ing] no difference in outcomes in first-trimester medical and aspiration abortion by provider type and indicat[ing] that trained [advanced practice clinicians] can provide abortion services safely."  *Id*.

The National Academies of Sciences, Engineering, and Medicine (National Academies) —a body composed of highly esteemed experts that was first established by Congress in 1863 to provide independent, objective expert analysis and advice to the Nation to inform public policy—similarly has concluded that "APCs (physician assistants, certified nurse-midwives, and nurse practitioners) can provide medication and aspiration abortions safely and effectively." Health & Medical Division, Board on Health Care Services, National Academies, *The Safety and Quality of Abortion Care in the United States* 14 (2018).

COMPLAINT - 14

53.     The American Public Health Association (APHA) is the nation's leading public health organization.

54.     The APHA recognizes that physician-only requirements like the Idaho law are "[o]utdated" and expressly recommends that APRNs and physician assistants be permitted to provide medication and aspiration abortion care.  APHA, Policy No. 20112, *Provision of Abortion Care by Advanced Practice Nurses and Physician Assistants* (Nov. 1, 2011), https://www.apha.org/policies-and-advocacy/public-health-policy-statements/policy-database/2014/07/28/16/00/provision-of-abortion-care-by-advanced-practice-nurses-and-physician-assistants.

55.     The APHA has further explained that "[e]mpirical evidence . . . demonstrates the competency of [nurse practitioners, nurse-midwives, and physician assistants] in providing all aspects of medication abortion" and that "research findings indicate the ability of primary care clinicians—including [nurse practitioners, nurse-midwives, and physician assistants]—to provide aspiration abortions with complication rates comparable to those of physician abortion providers."  *Id.*

56.     The World Health Organization ("WHO") has likewise recognized that medication and aspiration abortion "can be safely provided" by APCs.  WHO, *Safe Abortion: Technical and Policy Guidance for Health Systems* 65 (2d ed. 2012).

### The Experience, Training, and Safety Record of APCs at Plaintiff's Clinics Underscore Their Ability to Safely Provide Medication and Aspiration Abortions

57.     PPGNHI employs or contracts with 4 APCs across its 3 locations in Idaho.  All specialize in women's health or family nursing, both of which encompass reproductive healthcare.

58.     The APCs who work at PPGNHI, including Mary Stark, are highly qualified clinicians.

59.     Like other APCs in Idaho, they provide a broad range of health care services, have extremely broad prescriptive authority, and regularly prescribe both FDA-approved and Scheduled medications.

60.     At PPGNHI, Mary Stark has specific experience in medication and aspiration abortion care or comparable services.

61.     For instance, Ms. Stark safely provides medication abortion care at PPGNHI's clinics in Washington state.  She has been doing so for 9 years.  However, because of the Physician-Only Law, she is prohibited from providing identical care at PPGNHI's Idaho clinics.

62.     PPGNHI APCs safely prescribe medication in the context of miscarriage management, or to evacuate any retained tissue in a patient's uterus following an abortion. However, because of the Physician-Only Law, they are prohibited from prescribing the same medication to induce an abortion.

63.     Mary Stark safely performs aspiration procedures in the context of miscarriage management, or to evacuate any retained tissue in a patient's uterus following an abortion. However, because of the Physician-Only Law, she is prohibited from performing the identical procedure to induce an abortion.

64.     APCs at PPGNHI also regularly provide *all* elements of patient care before and after an abortion, including diagnosing and dating the pregnancy (typically by ultrasound), assessing any contraindications (*e.g.*, if the patient has an allergy, or the pregnancy is ectopic— located outside of the uterus), providing options counseling, developing a contraceptive plan, providing follow-up care to ensure that the abortion was complete, and assessing and managing any post-abortion complications.

65.     APCs at PPGNHI also regularly perform procedures that are comparable in risk and complexity to aspiration abortion, such as IUD insertions and removals.

66.     To the extent necessary, APCs at PPGNHI have the ability to obtain additional training to achieve competency in medication and aspiration abortion.

67.     Indeed, PPGNHI regularly trains APCs at its Hawaii and Washington clinics in medication abortion care, and APCs have been safely providing medication abortions in clinics for years.

68.     PPGNHI regularly trains and credentials APCs in Idaho in procedures that are comparable in skill and complexity to aspiration abortion care.

69.     PPGNHI maintains detailed protocols for training and credentialing APCs in new skills. These typically involve a combination of didactic requirements, clinical observation, a period of proctored care, and review of relevant patient records.

70.     This mirrors the training and credentialing process that PPGNHI uses for physicians.

71.     If not for the Physician-Only Law, 4 APCs at PPGNHI could immediately begin providing medication abortions, and 2 APCs (including Ms. Stark) could immediately begin providing aspiration abortion care.  Other APCs at PPGNHI would immediately pursue training to expand their scope of practice to encompass both medication and aspiration services.

**E.      The Physician-Only Law Significantly Impedes Access to Abortion and Causes Medical, Emotional, and Financial Harm to Idaho Women.**

**Because of the Physician-Only Law, Idaho Women Often Have to Travel Extremely Long Distances to Access Abortion Care, Which Many Cannot Afford**

72.     As of 2014, 95% of Idaho counties had no clinics that provided abortions, and 39% of women aged 15-44 lived in those counties.[23]  In total, 68% of women in Idaho live in counties without abortion clinics.[24]  There are only five locations in the entire state where a woman can access abortion care, and only three of them are clinics (as opposed to doctors in private practice who may not accept all patients).[25] Even a woman who lives in a county with abortion availability is not guaranteed easy access.

---

[23] Rachel K. Jones & Jenna Jerman, *Abortion Incidence and Service Availability in the United States, 2014*, 49 Perspectives on Sexual & Reproductive Health 17 (2017) (table 4).
[24] *Id.*
[25] *Id.*

99490287.2 0099880-01204

73.     A woman facing long travel distances typically must arrange and pay for transportation and arrange to take time off work.  Low-wage workers often have no access to paid time off or sick days, so even if a pregnant woman is able to get time off work, she is likely to have to forgo being paid.  These costs can be prohibitive for poor and low-income women.

74.     A woman facing long-distance travel to access an abortion may also have to arrange and pay for child care as most abortion patients in the United States already have at least one child.[26]

75.     14.4% of Idaho's population lives in poverty.[27]  The poverty rate among women between 18 to 64 years old is 15.5%.[28]  The rate is also disproportionately high amongst people of color; 25.1% of African-Americans, 15.7% of Asian-Americans, 22.1% of Latinos and 26.6% of Native Americans live below the poverty line.[29] To make matters worse, the federal poverty level is widely considered an inadequate measure of poverty, as it does not take into account the cost of child care, medical expenses, utilities or taxes.[30]  Thus, there are more Idaho residents struggling with poverty than these numbers indicate.

76.     Due to a combination of factors, including relative lack of access to medical services and difficulty accessing and affording contraceptives, low-income women have more unintended pregnancies, and therefore higher abortion rates, than women with higher incomes. Consequently, a disproportionately high percentage of women who seek abortions nationwide have poverty-level incomes.[31]

77.     Plaintiffs' poor and low-income patients routinely tell them that they do not have, and will not be able to find, the money they need to travel to a clinic in a different city for

---

[26] *Characteristics of U.S. Abortion Patients in 2014 and Changes Since 2008*, *supra* note 6.
[27] *QuickFacts: Idaho*, U.S. Census Bureau, https://www.census.gov/quickfacts/fact/table/ID/PST045216 (last visited Nov. 15, 2018).
[28] *Idaho 2017*, TalkPoverty, https://talkpoverty.org/state-year-report/idaho-2017-report/ (last visited Nov. 15, 2018).
[29] *Id.*
[30] Thomas C. Frohlich, Michael B. Sauter and Alexander Kent, *Progress in Fighting Poverty in America Has Slowed Despite Recent Economic Recovery*, USA Today, October 1, 2018, https://www.usatoday.com/story/money/economy/2018/10/01/fighting-poverty-america-slowing-despite-recent-economic-recovery/1445296002/ (last visited Nov. 28, 2018)
[31] *Characteristics of U.S. Abortion Patients in 2014 and Changes Since 2008*, *supra* note 6.

abortion care.  Although Idaho's Medicaid program covers the cost of transportation to receive

Medicaid-covered health services, because Idaho's Medicaid program excludes coverage for

abortion in almost all cases, Plaintiffs' poor and low-income patients who are enrolled in or

eligible for Medicaid cannot receive state assistance either with the cost of their abortions or with

the cost of travel to their appointments.  In any event, transportation costs are but one of multiple

barriers to a low-income woman's ability to travel to obtain abortion care.

78.     As a result of lengthy travel distances, some women are simply unable to obtain

an abortion and are instead forced to carry a pregnancy to term against their will.[32]

### Because of the Physician-Only Law, Idaho Women Can Access Abortion Care Only on a Limited Number of Days, Causing Delays and Other Forms of Harm, and Preventing Some Women from Accessing Abortion Care at All

79.     Because of the Physician-Only Law, the days on which a woman can obtain an

abortion at Planned Parenthood in Idaho are very limited: (1) on Thursday, she can obtain a

medication or aspiration abortion in Meridian; (2) on two Wednesdays per month, she can obtain

a medication or aspiration abortion in Twin Falls; and (3) on Friday, she can obtain a medication

abortion in Boise.

80.     In addition, medication abortion is available via telemedicine, but due to limited

physician availability, this service is only available during narrow windows. For instance,

medication abortion is only available by telemedicine approximately 1-2 half days per week.

81.     Because of the Physician-Only Law, there are no publicly accessible clinics in

Idaho regularly offering evening or weekend appointments for abortion care.

82.     This presents significant logistical challenges for the many patients who need to

take time off work and/or arrange for child care for their abortion appointment.

83.     The lack of evening or weekend options for abortion care also makes it more

difficult for patients to maintain the confidentiality of their pregnancy and abortion decision from

---

[32] Alyssa Llamas et al., Jacob's Institute of Women's Health, George Washington University, *Public Health Impacts of State-Level Abortion Restrictions: Overview of Research & Policy in the United States* 20-27 (Apr. 2018), https://publichealth.gwu.edu/sites/default/files/downloads/projects/JIWH/Impacts_of_State_Abortion_Restrictions.pdf.

COMPLAINT - 19

employers, colleagues, neighbors, and those family members they decide not to inform.  For women in abusive relationships who need to keep their pregnancy and abortion decision secret, this can endanger their safety.

84.     Plaintiffs' patients frequently implore them for an appointment on a different day of the week. Unfortunately, because of the Physician-Only Law, Plaintiffs are rarely able to accommodate these requests.

85.     While PPGNHI has mitigated some of these burdens by using telemedicine to provide some medication abortion services in Twin Falls, this delivery method is still limited by physician availability.  The physicians employed by PPGNHI or with whom PPGNHI contracts to provide abortions all work outside PPGNHI, either in their own private practices or both practicing and teaching as part of a residency program.  As a result, PPGNHI generally only has a physician available 1-2 days per month to provide medication abortions via telemedicine in Twin Falls.

86.     In addition, as previously noted, the physicians who typically can provide telemedicine consultations for medication abortion have very limited availability.  There are usually only a few slots available to serve multiple telemedicine locations in Idaho, and it can be very difficult to get an appointment.

87.     Scheduling these telemedicine appointments is complicated and time-consuming, primarily because of the need to coordinate with the schedule of a physician in Meridian.  These scheduling challenges delay patients' appointments, typically by about a week.

88.     These delays can mean the difference between obtaining a medication abortion and an aspiration abortion, with meaningful repercussions for women's health and well-being. Medication abortion is medically indicated for certain women (e.g., women with uterine fibroids), and strongly preferred by others (e.g., sexual assault survivors for whom the insertion of instruments into the vagina may cause emotional and psychological trauma).

89.     In addition, although abortion is extremely safe, the risks associated with the procedure increase with each additional week of pregnancy.

COMPLAINT - 20

90.     A woman who is delayed more than 10 weeks after her last menstrual period will lose not only the option of a medication abortion but also the option of a telemedicine abortion, and will often have to travel lengthy distances to obtain care.

91.     It is not uncommon that a patient estimated to be at 9 weeks of pregnancy or more contacts PPGNHI seeking a medication abortion and lives over an hour from the nearest provider of aspiration abortion care.  Because of scheduling delays caused primarily by the Physician-Only Law, these patients are often pushed past the limit for medication abortion and have to travel to Meridian, or wait up to two weeks in Twin Falls, to obtain an aspiration abortion instead—or forgo abortion care all together.

92.     In addition, because the cost of an abortion increases as gestational age advances, patients may face additional costs as a result of these delays—which is a serious burden for many patients, especially low-income patients.

93.     At PPGNHI, the delays resulting from the Physician-Only Law are often exacerbated by the time it takes patients to raise money for the procedure (which, because of delays caused by the Physician-Only Law, may be more expensive) and for travel to the procedure (which, because of the Physician-Only Law, may be far longer and more expensive). As a result of these factors, some patients are pushed past the point in pregnancy when they can obtain abortion care in Idaho.

### Invalidating the Physician-Only Law Will Expand the Availability of Abortion Care

94.     If the Physician-Only Law were invalidated, abortion care would be available in Idaho six days of the week, for longer hours (including evenings and weekends).

95.     In addition, many more Idaho women would be able to obtain abortion care from the same APRN in their community from whom they receive other primary, gynecological, and/or prenatal care.

96.     This expanded access would dramatically reduce delays and the associated medical, emotional, and financial harm that women in Idaho are experiencing as a result of the Physician-Only Law.  Additionally, many more women in Idaho would be able to receive care in

COMPLAINT - 21

or near their own communities without the expense and logistical challenges of traveling long distances.

## CLAIMS FOR RELIEF

### COUNT I

### (Substantive Due Process – Patients' Right to Privacy)

1.1     The allegations of paragraphs 1-96 are incorporated as though fully set forth herein.

1.2     The Physician-Only Law violates Plaintiffs' patients' right to liberty and privacy as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution as it imposes an undue burden their liberty to choose to have an abortion.

### COUNT II

### (Equal Protection – Plaintiffs and Their Patients)

2.1     The allegations of paragraphs 1-96 are incorporated as though fully set forth herein.

2.2     The Physician-Only Law violates the equal protection rights of APCs, as guaranteed by the Fourteenth Amendment to the U.S. Constitution, by treating APCs differently than physicians, who are for all relevant purposes similarly situated, without adequate justification.

2.3     The statute violates the equal protection rights of Plaintiffs' patients, as guaranteed by the Fourteenth Amendment to the U.S. Constitution, by singling out abortion, a medical procedure that only women require, for stricter regulation than other comparable health care services, without adequate justification.

**WHEREFORE**, Plaintiffs respectfully request that the Court

1.     declare that Idaho Code § 18-608A is unconstitutional as applied to APCs who perform medication and aspiration abortion;

COMPLAINT - 22

2.      enjoin Defendants, their employees, agents, and successors in office from enforcing Idaho Code §§ 18-608A and 18-605(3) against APCs who perform medication and aspiration abortion, and enter this injunction without bond;

3.      award Plaintiffs costs and attorneys' fees pursuant to 42 U.S.C. § 1988(b); and

4.      grant Plaintiffs such other, further, and different relief as the Court may deem just and proper.

DATED:  December 14, 2018.             STOEL RIVES LLP

                                       /s/ Nicole Hancock
                                       Nicole Hancock, ISB No. 6899
                                       nicole.hancock@stoel.com
                                       101 S. Capitol Boulevard, Suite 1900
                                       Boise, ID  83702

                                       *Attorneys for Plaintiffs*

COMPLAINT - 23